**Ricky DAVIS Plaintiff**

v.

**FORD MOTOR COMPANY,
et al Defendant**

**No. CIV.A.3:01CV–549–H.**

United States District Court,
W.D. Kentucky
at Louisville.

Jan. 31, 2003.

Callie E. Walton, Howard & Helmers, Louisville, KY, for Plaintiff.

B. Todd Thompson, Sallie Jacobs Stevens, Thompson, Miller & Simpson, Louisville, KY, for Ford Motor Corp.

Robert Y. Gwin, Rebecca A. Wood, Frost Brown Todd, Louisville, KY, for Budd Co.

Penelope Justice Turner, Robinette & Associates, Pikeville, KY, for Pikeville Methodist Hospital.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

On August 25, 2000, Ricky Davis, an employee of The Budd Company ("Budd"), was injured while closing a shipping rack used to transport metal crew cab roof panels from Budd to Ford Motor Company's Kentucky Truck Plant. Davis received workers' compensation benefits from Budd, and then filed this common law negligence action against Ford. Ford has moved for summary judgment on the ground that Ford qualified as Budd's "contractor" under the Kentucky Workers' Compensation Act ("the Kentucky Act"), KRS 342.610, and therefore, the Act's exclusive remedy provision bars this action. The outcome of Ford's motion depends on whether Budd is regarded as merely a supplier of goods, or as a subcontractor engaged in the execution or performance of a regular or reoccurring part of Ford's business.[1] Only if the latter is true is Davis confined to his remedies under the Kentucky Act, otherwise, he is free to maintain the present negligence action against Ford. The Supreme Court of Kentucky has yet to speak on this precise issue. For the reasons set forth below, the Court finds the Kentucky Workers' Compensation Act is inapplicable here and that Davis may proceed with his negligence action against Ford.

### I.

The essential facts are not in dispute. Ford is in the business of designing, selling, and manufacturing motor vehicles. Ford contracts with Budd to produce metal crew cab roof panels for use at its Kentucky Truck Plant. The written agreement between the parties outlines and defines their respective duties and responsibilities. The agreement describes the parties as "buyer" and "seller," and requires Ford to submit purchase orders to Budd. The agreement also contains general, default provisions relating to such things as how the goods are to be shipped, delivered, marked and taxed.

---

1. Or stated conversely, whether Ford is regarded merely as a purchaser of goods, or Budd's statutory contractor as that term is defined by KRS 342.610(2).

Budd stamps the crew cab roof panels at its plant in accordance with Ford's specifications. Under the parties' agreement, Budd is responsible for loading the completed panels on J–23 W Racks ("the racks"), which Ford supplies, for delivery to Ford's Kentucky Truck Plant. Once the racks are loaded, Budd's role in the delivery process is basically complete. Ford contracts with various third party carriers to pick up the full racks from Budd and deliver them to its Kentucky Truck Plant. When the panels reach their final destination, Ford's employees unload them from the racks. Ford then transports the racks back to Budd for reuse. Budd's employees do not perform any of their work at the Ford plant, do not unload the panels themselves, or participate in any way in the actual assembly of the crew cab roofs onto Ford's trucks.

Davis was employed by Budd in its press shop department. Davis's responsibilities in the press shop department included loading finished products onto the shipping racks. On August 25, 2000, Davis was tagging and closing shipping racks containing completed Ford crew cab roof panels. While attempting to close one of the racks, it jammed causing Davis to suffer injuries to his hand and wrist. After receiving workers' compensation benefits from Budd, Davis filed the present action against Ford. Davis alleges that Ford negligently caused injury to the rack by leaving it open during transport, failing to warn him of the damage to the rack by tagging it as damaged, and failing to remove the damaged rack from its rack fleet. Indeed, Ford's employees are supposed to close the racks after unloading the panels at the Truck Plant.

## II.

■ Resolution of Ford's motion for summary judgment depends on whether Ford can establish common law tort immunity based on the Kentucky Act. Section 342.690(1) of the Act provides:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee ... and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. For purposes of this section, the term "employer" shall include a "contractor" covered by subsection 2 of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.

KRS 342.690(1). Section 342.610(2)(b) defines "contractor" as a "person who contracts with another ... [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person." KRS 342.610(2)(b). Read together these two provisions, KRS 342.690(1) and KRS 342.610(2)(b), form the basis for what is known as the "up the ladder" defense: an entity "up the ladder" from the injured employee and who meets all the qualifications of a "contractor" under KRS 342.610(2) is entitled to the immunity provided by KRS 342.690. *See Goldsmith v. Allied Bldg. Components, Inc.*, 833 S.W.2d 378, 381 (Ky.1992). Thus, if Ford qualifies as a contractor under KRS 342.610(2), then it has no liability in tort to Davis because he has already received workers' compensation benefits through his immediate employer, Budd. *See U.S. Fidelity & Guar. Co. v. Technical Minerals, Inc.*, 934 S.W.2d 266, 267 (Ky. 1996).

### A.

"Kentucky courts have not mapped precisely the contours of section 342.610." *Thompson v. The Budd Co.*, 199 F.3d 799, 805 (6th Cir.1999). Indeed, while Ken-

tucky courts have generally addressed the availability of the "up the ladder" defense on numerous occasions, no Kentucky court has decided whether a purchaser of component parts, like Ford, qualifies as a contractor under KRS 342.610(2). *See, e.g., Fireman's Fund Ins. Co. v. Sherman & Fletcher,* 705 S.W.2d 459 (Ky.1986) (employee injured while performing rough framing carpentry work on frame of house being constructed by general contractor); *Daniels v. Louisville Gas and Elec. Co.,* 933 S.W.2d 821 (Ky.App.1996) (employee injured while performing emissions testing on coal-fired generators at defendant's power station); *Thompson,* 199 F.3d at 803 (6th Cir.1999) (plaintiff injured while in the process of changing air filters at defendant's plant); *Decker v. Ford Motor Co.,* 1997 WL 640114 (6th Cir. Oct. 14, 1997) (plaintiff injured while removing obsolete tooling from an assembly line at defendant's plant); *Granus v. North American Philips Lighting Corp.,* 821 F.2d 1253 (6th Cir.1987) (employee injured while refurnishing tank at defendant's manufacturing plant); *Smothers v. Tractor Supply Co.,* 104 F.Supp.2d 715 (W.D.Ky. 2000) (plaintiff injured while transporting merchandise from defendant's warehouse to its storeroom); *Sharp v. Ford Motor Co.,* 66 F.Supp.2d 867 (W.D.Ky.1998), *aff'd,* 194 F.3d 1314, 1999 WL 801554 (6th Cir. 1999) (plaintiff injured while loading rail cars at defendant's assembly plant). In each of these cases, the injured employee was performing some type of service, *i.e.,* cleaning, repairing, replacing, at the defendant's place of business. Therefore, these cases are not directly helpful because, factually, the present case is much different. First, Davis was not injured on Ford's premises, rather the injury occurred at Budd. Second, and perhaps more importantly, Davis's injury occurred in conjunction with the manufacture and delivery of finished component parts, not simply in conjunction with the rendition of services.

The parties have not cited, and the Court has not located, any authority from Kentucky dealing with whether Ford qualifies as Budd's contractor for the purposes of the Kentucky Act under such circumstances.

Having no direct guide, the Court must predict how Kentucky's highest court would decide the issue based on the all available data. *See Dinsmore Instrument Co. v. Bombardier, Inc.,* 199 F.3d 318, 320 (6th Cir.1999). In so doing, the Court has examined such evidence as is available from the Kentucky Act itself and the Kentucky courts' history of interpreting the Act. Unfortunately, this evidence does not point to a clear answer. Accordingly, the Court has also consulted authorities from other jurisdictions that have grappled with this same issue. The Court has concluded from its examination that authority, reason and justice support the conclusion that under these circumstances Ford should not be considered a "contractor" within the meaning of KRS 342.610(2).

### B.

The Court begins its analysis with the language of the Kentucky Act. Under the Kentucky Act a "contractor" is defined as one that contracts with another to have "work performed which is a regular or recurrent part of the work of the trade, business, occupation or profession of such person." KRS 342.610(2). The Kentucky Act itself defines work as "providing *services* to another in return for remuneration on a regular and sustained basis in a competitive economy." KRS 342.0011(34) (emphasis added). Specifically omitted from the definition of "work" is any mention of the supply of goods, materials, or products. This gives some indiction that the legislature intended the immunity granted in the Kentucky Act to cover only those persons that contract for the pur-

chase of services as opposed those that contract for the purchase of goods, products, or materials. *See Hearn v. Com.*, 80 S.W.3d 432, 438 (Ky.2002) ("The express mention of certain conditions of entitlement [in a statute] implies the exclusion of others.")

Comments from Kentucky's highest court appear to support a similar distinction, particularly in relation to a contractor's duty to provide workers' compensation coverage. *See Elkhorn–Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101, 104 (Ky.1976). In *Elkhorn–Hazard* the Supreme Court of Kentucky was confronted with the issue of whether a land corporation which leased the right to mine coal in a parcel of land to a coal company had an obligation to provide compensation payments to the coal company's employees under KRS 342.610(2). *See id.* In reaching its conclusion that no such obligation existed, the Kentucky Supreme Court stated in dicta that: "If this were a sale of coal ... we do not think that it could be contended successfully that the seller has an obligation to provide workmen's compensation for the employees of the purchaser... [t]his fact strengthens the conclusion that M & A Coal Company was not performing work for Elkhorn–Hazard under the lease." *Id.* Although the *Elkhorn–Hazard* Court stopped short of actually holding that KRS 342.610(2) does not apply to the sell and purchase of goods, products, or materials, its statement further supports a distinction between goods and services under the Kentucky Act. *See id.*

■ Additionally, as a general rule, the vast majority of courts from other jurisdictions hold that a mere recipient of goods or materials is not a statutory contractor for the purposes of workers' compensation benefits. *See, e.g., Doyle v. Missouri Val. Constructors, Inc.*, 288 F.Supp. 121 (D.Colo.1968); *Gray Bldg. Sys. v. Trine*,

260 Ga. 252, 391 S.E.2d 764 (1990); *Hacker v. Brookover Feed Yard, Inc.*, 202 Kan. 582, 451 P.2d 506 (1969); *Shipley v. Gipson*, 773 S.W.2d 505 (Mo.App.1989); *Wilson v. Daniel Intern. Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973); *Yancey v. JTE Constructors, Inc.*, 252 Va. 42, 471 S.E.2d 473 (1996); *Garrett v. Tubular Prods., Inc.*, 176 F.Supp. 101 (E.D.Va.1959); Arthur Larson, *Larson's Workers' Compensation Law* § 70.06[8] (2002). There appears to be two notable exceptions to this general rule: (1) when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with goods sold; or (2) when the transaction is a mere devise or subterfuge to avoid liability. *See, e.g., Hacker*, 451 P.2d at 511; *Wilson*, 197 S.E.2d at 686; *Gray Bldg. Sys.*, 391 S.E.2d at 764. The Court believes the distinction these courts make is both necessary and appropriate.

The rule that the mere recipient of goods is not a statutory contractor makes a great deal of sense. To apply workers' compensation statutes to the ordinary sale of merchandise would significantly disrupt and change commerce and business dealings. *See Bendure v. Great Lakes Pipe Line Co.*, 199 Kan. 696, 433 P.2d 558, 564 (1967). Classifying mere purchasers of goods as "contractors" simply because they use the purchased goods stretches the immunity provisions of the workers' compensation laws far beyond their intent and the limits of reason. "The humane spirit of the statute [the Kentucky Workers' Compensation Act] does not warrant its extension beyond its legitimate scope." *Gateway Const. Co. v. Wallbaum*, 356 S.W.2d 247, 248–49 (Ky.1962). The intended purpose of KRS 342.610(2) is to "discourage contractors from hiring fiscally irresponsible subcontractors and thus eliminate workers' compensation liability." *Matthews v. G & B Trucking, Inc.*, 987

S.W.2d 328, 330 (Ky.App.1998). "It accomplishes this purpose by imposing workers['] compensation liability upon the 'upthe-ladder' contractor for compensation to the employees of a subcontractor unless the subcontractor has provided for the payment." *Id.* Because the "up the ladder" contractor is ultimately responsible for providing workers' compensation benefits to injured employees of its subcontractors, the contractor enjoys the immunity provided by KRS 342.690(1). Practically speaking, the effect of classifying the large number of purchasers of goods as statutory contractors is to make them immune from negligence actions, which could be to the detriment of Kentucky workers. This cannot be what the Kentucky General Assembly had in mind when it enacted KRS 342.610(2). More likely, the General Assembly intended to limit KRS 342.610(2) to situations where the "contractor" has some control over the subject employee and his working environment as is generally present when one contracts to have services performed that are a regular or reoccurring part of one's business.

■ Based upon the Kentucky Act's definition of "work," the Supreme Court of Kentucky's statements in *Elkhorn–Hazard,* and the purposes underlying KRS 342.610(2), the Court predicts that the Kentucky Supreme Court would adhere to the majority view that a mere purchaser of goods is not a statutory contractor of the seller for the purposes of the Kentucky Workers' Compensation Act, absent some special circumstances.

### III.

■ Finally, the Court must decide whether Ford should be classified as a contractor or a purchaser of goods. Ford argues that it should be considered a "contractor" because the crew cab roofs it purchases from Budd are a necessary part of the trucks it produces. Of course, screws and bolts are also no doubt a necessary part of all Ford's trucks. Does this mean then that each supplier of hardware that is incorporated into Ford's trucks should be deemed Ford's subcontractor? The Court finds *Garrett, supra, Yancey, supra,* and *Gray Bldg. Sys., supra,* particularly persuasive in answering this question.

In *Garrett,* plaintiff's employer contracted with the defendant to deliver fabricated steel columns to defendant's construction site. *See Garrett,* 176 F.Supp. at 102. The steel was to be fabricated according to defendant's specifications. *See id.* at 103. Plaintiff was injured while delivering the columns and attempted to bring a negligence action against the defendant. *See id.* The district court held that Virginia's workers' compensation act did not bar the action. The court explained:

> Tubular [plaintiff's employer] occupied precisely the same position as would a supplier of brick or cement, who made a sale to a contractor, whether a general contractor or a subcontractor. The fact that the steel was fabricated by Tubular is of no importance. There might well be a situation in which a brick manufacturer contracted to furnish certain special type of brick, such as is often used in the restoration of ancient buildings. Of course, the purchaser would be entitled to examine samples and if desirable to visit the premises where the manufacture was taking place. The dates of delivery and the method of delivery are commonly a part of the order. A written contract between the parties referring to the supplier of the material as a subcontractor does not make him a subcontractor. It is my conclusion that under the facts of this case it is clear that Tubular was the seller of material and not a subcontractor.

*Id.* at 104.

More recently, in *Yancey* the Supreme Court of Virginia reached a similar conclu-

sion. *See Yancey,* 471 S.E.2d at 473. In *Yancey,* the plaintiff's immediate employer, RECO, contracted with the defendant to design, manufacture, and deliver sound barrier wall panels to the defendant's job site. *See id.* at 474. Defendant, not RECO, was responsible for incorporating the panels into a sound barrier wall it had contracted with the state of Virginia to construct along Interstate Highway 66. *See id.* Plaintiff was severely injured while inspecting one of the panels at the construction site. *See id.* After collecting workers' compensation benefits the plaintiff attempted to sue the defendant for negligence. *See id.* The Supreme Court of Virginia rejected the defendant's argument that the plaintiff's employer was its subcontractor reasoning that RECO did not perform any services apart from manufacturing and delivering the panels. *See id.* at 475. The court found it particularly relevant that the plaintiff did not actually participate in incorporating the panels into the sound barrier wall. *See id.*

Likewise, in *Gray Bldg. Systems,* the Supreme Court of Georgia held that the purchaser of fabricated door and windows lintels was not a statutory contractor for the purposes of Georgia's workers' compensation scheme. *See Gray Bldg. Sys.,* 391 S.E.2d at 764. There, defendant contracted with plaintiff's employer to purchase door and window lintels which defendant needed for its construction project. *See id.* The lintels had to be fabricated by a welder according to specific measurements. *See id.* The plaintiff's employer was only to make the lintels, another party was actually responsible for their installation. *See id.* The plaintiff was injured while unloading the lintels. *See id.* As a result, he attempted to recover workers' compensation benefits directly from the defendant. *See id.* The Georgia Supreme Court rejected plaintiff's claim, however, because it determined that the defendant was a purchaser, not a "contractor" under

the circumstances as the plaintiff did not render any additional services in connection with the installation of the lintels. *See id.*

■ Together these cases stand for the proposition that one who supplies goods, even component parts, does not cross the line from a supplier to a subcontractor for the purposes of a standard workers' compensation scheme unless that person renders some type of additional services or assistance in relation to the goods supplied. Thus, that the roofs are a necessary part of Ford's trucks does not automatically transform Ford into a contractor for the purposes of KRS 324.610(2). Some additional conduct is required. In this case, the parties never contemplated that Budd would provide any services to Ford apart from producing and preparing the crew cab roof panels for delivery to Ford. Davis was injured while loading the finished crew cab roof panels onto racks for delivery to Ford. Davis's actions did not extend to incorporating the crew cab roof panels into Ford's trucks or rendering any additional services at the Ford Truck Plant. Davis was not involved in any activity integral to the operation of the Truck Plant, other than producing a component part at an entirely separate location. That Budd manufactured the crew cabs according to Ford's specifications does not change the Court's conclusion.

Naturally, different scenarios could produce different results. If Davis had been injured while installing or assisting in installing a crew cab roof into a Ford truck, repairing or inspecting roof panels at Ford's plant, collaborating with Ford on the design of the roof panels, or performing some other service relating to the installation of the panels, the outcome of this case might change. However, those are not our facts. The Court is convinced that Kentucky law does not bar Davis from

pursuing his common law remedy against Ford.

The Court will enter an Order consistent with this Memorandum Opinion.

**ORDER**

On Defendant's motion for summary judgment, the Court having reviewed the memoranda and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is DENIED.

This is not a final and appealable order.